# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Crim. No. 16-0180 (ESH) |
| ) | |
| BRYNEE BAYLOR, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Brynee Baylor has filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons set forth below, defendant's motion will be denied.

## BACKGROUND

Brynee Baylor was indicted on October 6, 2016. (Indictment, ECF No. 1.) The indictment charged Ms. Baylor with conspiracy to commit securities fraud (Count One), securities fraud (Count Two), fraud in the first degree (Counts Three through Eight), obstruction of justice (Count Nine), and failure to file federal tax returns in 2010 and 2011 (Counts Ten and Eleven). (*Id.*) Defendant filed a pretrial motion to sever the tax counts (Ten and Eleven), which the Court granted on December 13, 2018. (Order, ECF No. 51.)[1]

The indictment alleged that between July 2010 and September 2012, Ms. Baylor, a former attorney, conspired to defraud investors with Frank Lorenzo, the president and CEO of

---

[1] The present motion for new trial only concerns the trial conducted on Counts One through Nine. Defendant pleaded guilty on June 20, 2019, to Count Ten, and Count Eleven was dismissed by the government as part of her plea agreement. (*See* June 20, 2019 Minute Entry; Plea Agreement at 1, ECF No. 130.)

the Milan Group, a client of hers.[2] The scheme consisted of representing to investors "that they could obtain extremely large profits in a short period of time with little or no risk through a purported trading program" that, in reality, did not return any money to investors. (Indictment ¶ 14.) The obstruction of justice count arose from civil litigation against Ms. Baylor that had been brought by the Securities and Exchange Commission ("SEC") in November 2011. (*Id.* ¶ 71.) The SEC lawsuit related to the same investment scheme that is the subject of this criminal case. *See SEC v. Milan Group*, 962 F. Supp. 2d 182, 186–89 (D.D.C. 2013). During the course of this civil litigation, Ms. Baylor testified at depositions on May 22, 2012 and September 18, 2012. (Indictment ¶ 72.) The government alleged that Ms. Baylor obstructed justice by lying during these depositions. (*Id.*)[3]

Jury selection began on April 8, 2019, the jury was sworn on April 9, and it heard testimony for approximately two weeks before beginning deliberations on April 25. The jury returned its verdict on April 29, finding Ms. Baylor guilty on seven counts: conspiracy to commit securities fraud (Count One), securities fraud (Count Two), and fraud in the first degree (Counts Three through Six and Eight). (Verdict Form, ECF No. 100.) The jury hung on one fraud charge related to investor Santos Soto (Count Seven), and acquitted Ms. Baylor of the obstruction of justice charge (Count Nine). (*Id.*)[4]

---

[2] Ms. Baylor's co-conspirator, Frank Lorenzo (also known as Frank Pavlico), committed suicide in December 2012, several years before criminal charges were brought against Ms. Baylor. (*See* Ct. Ex. 1.)

[3] The indictment also alleged that Ms. Baylor obstructed justice by lying in an affidavit filed in the SEC litigation, but the government dismissed this claim prior to opening statements. (*See* Indictment ¶ 73; Apr. 9 am Tr. at 2–3.)

[4] In exchange for Ms. Baylor's guilty plea to Count Ten, the government agreed to dismiss Count Seven. (Plea Agreement at 1.)

After filing two motions for extension of time to file a motion for new trial, both of which were granted, defendant filed her motion for new trial on June 14, 2019. (Def. Mot. for New Trial ("Def. Mot."), ECF No. 127.) The government filed an opposition on July 3, 2019 (Gov't Opp., ECF No. 133), and defendant's reply was filed on July 12, 2019. (Def. Reply, ECF No. 136.)[5]

## ANALYSIS

### I. LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A new trial is warranted "'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Ring*, 768 F. Supp. 2d 302, 310 (D.D.C. 2011) (internal citation omitted). Where a motion for new trial is made on the grounds that the verdict was against the weight of the evidence, "the district judge weighs the evidence and evaluates the witnesses' credibility and decides whether a serious miscarriage of justice may have occurred." *United States v. Dale*, 991 F.2d 819, 838 (D.C. Cir. 1993) (internal citation and quotation marks omitted).

### II. DEFENDANT'S MOTION FOR NEW TRIAL

Defendant's motion raises the following arguments in support of her request for a new trial: 1) the verdict was against the weight of the evidence, 2) the Court erred in its selection of which alternate juror would replace an excused juror, 3) exculpatory evidence related to Valner Johnson was not disclosed before trial, 4) defendant's statements in depositions during the SEC

---

[5] The government filed a motion for leave to file a sur-reply on July 22, 2019. (ECF No. 141.) This motion is DENIED as moot, as the government's sur-reply is not necessary to the Court's resolution of this matter.

litigation should have been suppressed because her Fourth Amendment rights were violated, and 5) the prosecution engaged in improper speculation during closing arguments. (Def. Mot. at 4–9.) Each of these arguments will be addressed *seriatim*.

### A. Sufficiency of the Evidence

Defendant's motion contends that "[t]he government did not meet [its] burden to prove beyond a reasonable doubt with respect to all counts that Ms. Baylor had actual knowledge she was committing these crimes." (Def. Mot. at 1.)[6] The Court disagrees. Contrary to defendant's assertion, there was compelling evidence to support the jury's finding that Ms. Baylor had the necessary *mens rea* and intended to defraud investors. Defendant's theory that she was deceived by Mr. Lorenzo and others was thoroughly presented by her own trial testimony, but the jury had good reason to reject it. No serious miscarriage of justice occurred; on the contrary, the jury heard extensive evidence to support a finding that Ms. Baylor acted with the requisite state of mind.

Based on the evidence introduced at trial, a jury could reasonably find that investors deposited over $2 million in Ms. Baylor's law firm's IOLTA account, often based on her representations that the investment would succeed and provide extraordinarily high returns within a short period of time, that these projections had been realized in the past, that investors could get back their investment, that any fees would be taken out of the profits and not the investors' principal, and that the investors' money would not be at risk. (*See* Gov't Ex. 509.) None of these assurances were true. For instance, jurors heard direct evidence that defendant made these false representations on a recorded phone call conducted by undercover FBI agents. On this call, defendant told those whom she believed to be interested investors that they would

---

[6] Defendant's motion devotes a mere two paragraphs to this argument. (*See* Def. Mot. at 1, 8.)

4

receive a "250 percent return" on their funds within 30 days, that she had seen these transactions successfully completed, that she did not think "that there [was] a risk" of them losing money, that the funds were "not supposed to even be moved" because it they would be "escrowed the entire time," and that "100 percent" of the deposited funds would go into the investment with "no money . . . go[ing] . . . to fees." (Gov't Ex. 438-23.2T (transcript of FBI call); Gov't Ex. 438-23.2 (deposition video where the FBI call was played).) More than a half dozen investors testified at trial that Ms. Baylor had made similar promises to them. (*See, e.g.*, Apr. 12 pm Tr. at 38–40, 53, 56–57 (investor Larry Kudla describing that he transferred funds to defendant's escrow account because he understood the money to be safe there, had been told by defendant of past successful transactions, and was told he could expect a $10 million return on a $250,000 investment within seven days); Apr. 15 pm Tr. at 11–13 (investor Sidharth Dugar testifying that Ms. Baylor told him she had completed successful deals with the Milan Group before and that he understood the money to be safe in the escrow account).)

      The prosecution produced compelling evidence that Ms. Baylor's statements to these investors had been intentional misrepresentations. The government introduced bank statements showing that Ms. Baylor transferred investor funds out of her firm's IOLTA account soon after they were deposited, with investors never seeing their funds returned. (Gov't Ex. 444 (bank statements showing transfers out of the IOLTA account); *see also, e.g.*, Apr. 9 pm Tr. at 73 (William Barrett testifying that his money was never returned); Apr. 11 pm Tr. at 26–27 (Gregory Young testifying the same); Apr. 15 pm Tr. at 41 (Sidharth Dugar testifying the same).) No evidence was produced that the Milan Group had ever completed a successful transaction; instead, the prosecution introduced evidence that Ms. Baylor was specifically told by a Milan

Group employee in January 2011 that the Milan Group had not "closed any deals yet." (Gov't Ex. 533 (January 18, 2011 email from John Glidden to defendant).)

As early as fall 2010, investors were requesting their money back, but without success. (*See, e.g.*, Gov't Ex. 31-R (September 2010 email from Gloria Wu to Ms. Baylor requesting return of funds).) Investors testified about sending Ms. Baylor a barrage of emails, concerned that the savings that they had invested had disappeared—some going as far as to hire a lawyer in an attempt to get their funds returned. (*See, e.g.*, Apr. 12 am Tr. at 8–19 (Joseph Hunsberger testifying about his attempts to get his money back); Apr. 15 pm Tr. at 23 (Sidharth Dugar describing exchanging hundreds of emails with Ms. Baylor); Apr. 12 am Tr. at 85 (Attorney Cort Wiegand testifying about his hiring by investors Gloria and Joe Wu to try to get their money returned).)

Yet Ms. Baylor continued to participate in the scheme throughout 2011, despite warnings such as a March 5, 2011 email (which defendant claims not to have read) sent by a disgruntled investor that included an FBI notice about prime bank fraud schemes, which described how investment programs that "purport to offer above average market returns with below market risk through the trading of bank instruments are fraudulent." (Gov't Ex. 34-R.) Defendant's several days of trial testimony and emphasis on her mother's alleged investment of $15,000 sought to present an innocent gloss on her participation in the investment scheme. (*See* Ct. Ex. 3 (stipulation regarding defendant's mother's investment); Apr. 17 pm Tr. 4–94, Apr. 18 am Tr. 4–103; Apr. 18 pm Tr. 16–87; Apr. 23 am Tr. 23–101; Apr. 23 pm Tr. 3–79 (Ms. Baylor's trial testimony).) Yet the jury was not required to credit defendant's testimony or her theory of the case. The evidence introduced by the government amply supported a finding of the necessary *mens rea* to sustain a conviction on each of the seven counts.

## B. Selection of Alternate Juror

Defendant argues that the Court violated Federal Rule of Criminal Procedure 24(c)(2)(B), which provides that "[a]lternate jurors replace jurors in the same sequence in which the alternates were selected." As explained below, there was no violation of this rule. Prior to trial, the juror in seat 6 was chosen as the first alternate, and therefore, she was the proper juror to replace the regular juror who was excused on the second day of trial.

At a hearing on December 12, 2018, the Court asked each party to select a number to serve as an alternate seat. (Dec. 12 Hr'g Tr. at 54–55.) Defendant selected seat 6, and then the government selected seat 9. (*Id.*) At a subsequent hearing on March 25, the government asked the Court to seat a third alternate, to which defendant did not object. (Mar. 25 Hr'g Tr. at 52–53.) Defendant then selected seat 4 to serve as the third alternate. (*Id.* at 53.)

One juror was excused due to financial hardship on April 10, the day after jury selection had concluded and the jury was sworn. (Apr. 10 am Tr. at 16–17.) On that date, the Court mistakenly stated that juror 4 would replace the excused juror. (*Id.* at 2, 17.) Two days later, on April 12, the Court corrected its mistake and stated on the record that the juror in seat 6 was chosen first and therefore was the proper alternate to serve as the replacement. (Apr. 12 am Tr. at 2.) Defendant did not object when the Court stated that seat 6 would serve as the replacement, nor did she object at any time before the jury began its deliberations on April 25.

In her reply, defendant frivolously asserts that she was prejudiced by this brief mistake, as her counsel spent two days "strateg[izing] and formulating questions which would tend to sway the favor of juror number 4 toward the defense." (Def. Reply at 4.) This conclusory, unsupported statement hardly rises to a showing of prejudice. The Court complied with Rule

24(c)(2)(B), and a new trial is not warranted on the basis of the Court's quickly-corrected misstatement regarding who would serve as the replacement juror.

C. **Government Disclosure of Evidence Related to Valner Johnson**

Defendant's motion argues that there was "newly discovered evidence during trial regarding Valner Johnson" that requires a new trial be granted "so that a jury may hear all the facts from the beginning related to Mr. Valner Johnson, and that Ms. Baylor be given an opportunity to call Mr. Johnson as a witness." (Def. Mot. at 2, 8.) Defendant asserts that because new evidence regarding Mr. Johnson was not disclosed to defense counsel until trial, "all of the facts regarding Mr. Johnson could not be explored." (*Id.* at 8.) This argument is without merit.

Valner Johnson, formerly a Nevada attorney, was involved with Ms. Baylor in the investment scheme described at trial. Despite the potential relevance of his testimony, Mr. Johnson was never called as a witness by either party. At trial, the parties presented conflicting narratives regarding when Ms. Baylor first learned of Mr. Johnson's criminal past. Ms. Baylor testified that she believed Mr. Johnson to be a law-abiding, barred attorney during the time period that she worked with him on some of the investments described in the indictment. (*See* Apr. 17 pm Tr. at 61–68.)[7]

Mr. Johnson entered a guilty plea on May 18, 2011, to one count of making a false statement in violation of 18 U.S.C. § 1001 in federal district court in Nevada. (*See* May 18, 2011 Minutes of Proceedings, ECF No. 17, *United States v. Johnson*, No. 10-cr-571 (D. Nev.).) As part of his plea, Mr. Johnson admitted that he had lied to federal agents when he denied having

---

[7] In contrast, the government asserted that defendant learned of Mr. Johnson's conviction in June 2011, a month after his plea was entered. (*See* Gov't Ex. 550.)

8

"attempt[ed] to bribe a Bank of America employee to falsely report to third parties that [he] had a large sum of money in his Bank of America bank account." (Plea Agreement at 5–6, ECF No. 18, *United States v. Johnson*, No. 10-cr-571 (D. Nev.).)[8] At the time of his guilty plea, Mr. Johnson had already been disbarred from practicing law by the Nevada State Bar. (*See* Ct. Ex. 4.)

Defense counsel first indicated to the Court his awareness of Mr. Johnson's criminal history at the final pretrial hearing on April 3, 2019. (Apr. 3 Hr'g Tr. at 39–40.) Defense counsel had learned of Mr. Johnson's criminal conviction several weeks before, but he only realized its particular relevance to Ms. Baylor's case upon locating a November 11, 2010 email (ECF No. 77-4) that Mr. Johnson had sent to investors Paul Young, John Bach, and Matt Ferber, attaching what appears to be a false Bank of America bank statement for Mr. Johnson's law office's bank account. (*See* Apr. 8 Tr. at 21–22.) This email was turned over by the government long before the pretrial hearing and was part of the discovery materials provided to defense trial counsel, Mr. Benowitz, when prior defense counsel was allowed to withdraw. (*See* Apr. 3 Hr'g Tr. at 42–43.) There was no indication at the April 3 hearing that defense counsel was concerned about the lack of disclosure of Valner Johnson-related materials, or that counsel was considering calling Mr. Johnson as a witness. Instead, discussion of these materials related to whether they would be admissible. (*See id.* at 39–46.)

After the hearing, the Court entered an order requiring defendant to file a proffer regarding the evidence she sought to introduce relating to Valner Johnson's criminal history in

---

[8] The attempted bribe, which occurred around April 2010, predated Ms. Baylor's first meeting with Mr. Johnson. (*See* Press Release re Johnson Plea, ECF No. 77-3 (describing timing of Mr. Johnson's attempted bribe); Apr. 17 pm Tr. at 62–63 (Ms. Baylor testifying that she met Mr. Johnson at the end of July or early August 2010).)

order to assess its admissibility. (Apr. 4 Order, ECF No. 76.) On April 5, defendant filed a motion requesting the admission of extrinsic evidence related to Valner Johnson—in particular, the plea agreement from Mr. Johnson's criminal case in Nevada federal court, as well as a public statement from the U.S. Attorney's office in the District of Nevada about the plea. (Def. Mot. in Limine re Valner Johnson at 1, ECF No. 77.)

Defendant's motion in limine argued that this evidence regarding Valner Johnson was relevant because it showed "the extreme lengths . . . Mr. Johnson was willing to go to seduce potential investors." (*Id.* at 3–4.) Defendant indicated an intent to argue at trial that she, like the investors, was duped by Mr. Johnson and Mr. Lorenzo. (*Id.*) Defendant's motion in limine was ultimately denied as moot given the fact that the parties agreed to a stipulation regarding Mr. Johnson's criminal history, which was read to the jury on April 23. (*See* Apr. 25 Minute Order (denying the motion as moot); Apr. 23 pm Tr. at 79–80 (reading of stipulation regarding Valner Johnson).) The stipulation provided as follows:

> Valner Johnson was an attorney licensed in the State of Nevada in 2010. On July 28, 2010, search warrants were executed by the FBI on Mr. Johnson's home and business. Mr. Johnson was interviewed by FBI agents at that time, and he lied to agents about whether he had asked someone he believed to be a Bank of America employee to falsely verify that he had over $500,000,000 in his bank account, and had asked that SWIFT codes and banking transaction codes be made available to him.
> Valner Johnson was indicted on November 30, 2010 on one count of False Statement in violation of 18 U.S.C. § 1001 in Case No. 2:10-cr-571-GMN-PAL. He was disbarred on April 6, 2011. Mr Johnson entered a guilty plea to the indictment on May 19, 2011. On August 22, 2011, Mr. Johnson was placed on three (3) years of probation. On May 13, 2013, his probation was revoked and he was sentenced to seven (7) months in prison.

(Ct. Ex. 4.)

On April 8—the day before the jury was sworn—the Court inquired of the prosecution whether they had turned over to defense counsel all information related to Valner Johnson that was in their possession or in the possession of the SEC, the FBI, the U.S. Attorney's office in Nevada, or any other government entity. (Apr. 8 Tr. at 9–11, 17–19.) The prosecutor indicated that he had reached out to the SEC, the U.S. Attorney's office in Nevada, and the FBI to ensure that all relevant documents were identified and turned over. (*Id.* at 17–19.) By the end of the day on April 8, the government provided defense counsel with previously unproduced FBI 302s for Mr. Johnson and trial witness Larry Kudla, which were prepared as part of the investigation into Mr. Johnson's Nevada offense. (*Id.* at 35–37.) At no time did counsel ask for a continuance or request that Mr. Johnson be called.[9]

On April 8, the prosecutor also alerted the Court and defense counsel that the U.S. Attorney's office in Nevada had a case file for Mr. Johnson that had not yet been retrieved from storage. (Apr. 8 Tr. at 19.) Without objection by defendant, the trial proceeded while the case file was located. The case file was then retrieved, and the prosecution described the file's contents to the Court and defense counsel on April 15. (Apr. 15 pm Tr. at 102–06.) Upon hearing of the file's contents, defense counsel asked the government to review two documents therein for potential relevance to Ms. Baylor's case: the prosecution memo and the presentence report. (*Id.* at 104.) The government and the Court reviewed the prosecution memo, each summarizing it in open Court out of the presence of the jury. (Apr. 16 am Tr. at 111–12; Apr. 16

---

[9] Defendant's motion cites to an exchange that occurred on April 15, 2019, in which the Court stated that it was glad that the FBI 302s from Nevada were produced before trial began, as they were relevant and possibly exculpatory. (Def. Mot. at 7–8 (quoting Apr. 15 am Tr. at 7–8).) This exchange occurred in the context of discussing what information could be elicited from a witness given defense counsel's concerns regarding hearsay, not in the context of defense counsel arguing that the government had failed to turn over relevant information in time for defendant to adequately prepare for trial. (Apr. 15 am Tr. at 6–8.)

11

pm Tr. at 3–5.) The Court explained that the memo did not contain information relevant to Ms. Baylor's case beyond facts that were already known, and the Court concluded that the prosecution memo did not need to be produced to defense counsel. (Apr. 16 pm Tr. at 3–5.)

As for the presentence report, the Court received it from the district court judge in Nevada who had presided over Mr. Johnson's case, reviewed it, and described its contents to the parties on April 18. (Apr. 18 am Tr. at 103–06.) The report provided some background information relating to Mr. Johnson, such as his mental health, family, bankruptcies, and disbarment. (*Id.*) However, it did not provide any information that related to Ms. Baylor or any of the witnesses at trial. (*Id.*) Again, after hearing this summary of the prosecution memo and presentence report, defense counsel failed to indicate any need to look into the information further—in spite of the Court's specific urging that "if you think there's something that you need to pursue, we can discuss it." (*Id.* at 104.)

"When the government makes a disclosure that is late but is still during trial, the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result and not just that the evidence was material." *United States v. Wilson*, 720 F. Supp. 2d 51, 67 (D.D.C. 2010) (internal citation and quotation marks omitted). "[A] new trial is rarely warranted based on a *Brady* claim where the defendant[ ] obtained the information in time to make use of it." *Id.*

Defendant has failed to meet this standard, nor has she even attempted to argue that a *Brady* violation occurred here. She has not shown that any late disclosure of information related to Valner Johnson had any possible influence on the result in this case. Defendant's pretrial motion in limine establishes that defendant was well-aware of Mr. Johnson's relevance to the case and the details of his criminal history before trial began. She could have endeavored to

subpoena Mr. Johnson to testify but chose not to do so.[10] While the FBI 302s for Valner Johnson and Larry Kudla were not disclosed to defense counsel until jury selection began, they were turned over before opening statements. Moreover, it is not apparent how any new information learned from government disclosures subsequent to opening statements—namely from the prosecution memo and the presentence report in Mr. Johnson's Nevada case—was relevant to the defense case or could have possibly assisted in defendant's trial presentation.

Indeed, information regarding Valner Johnson was the subject of significant emphasis during defense counsel's opening statement (Apr. 9 pm Tr. at 33 ("Valner Johnson betrayed Ms. Baylor"), during defense counsel's cross-examination of key witnesses such as Larry Kudla (Apr. 12 pm Tr. at 72–109) and Christopher McLean (Apr. 11 am Tr. at 23–25, 35–38), as well as during the defense closing (Apr. 24 pm Tr. at 49–50 (describing how "Valner Johnson infected several of these . . . investments" and had "betrayed" defendant's "trust")). Defense counsel effectively utilized this information to forward the defense theory that Ms. Baylor had been tricked by the people she trusted, including Mr. Johnson. Moreover, the parties' stipulation regarding Valner Johnson's criminal history was admitted into evidence on April 23, and by virtue of this stipulation, the key evidence that defense counsel wanted to elicit was made known to the jury. Thus, a new trial on the basis of Valner Johnson-related evidence is not warranted.

**D. Suppression of Defendant's Depositions Taken During the SEC Litigation**

The government introduced into evidence twenty excerpts from two depositions, dated May 22, 2012 and September 18, 2012, that Ms. Baylor gave during the course of the related

---

[10] Of course, it may be unlikely that Mr. Johnson would have voluntarily testified, since arguably he could have invoked his Fifth Amendment rights. Defense counsel indicated that he had unsuccessfully tried to get in touch with Mr. Johnson before trial, but never indicated that he attempted to serve him with a subpoena. (Apr. 8 Tr. at 10.)

13

SEC civil litigation. (*See* Gov't Exhs. 438, 439.).[11] Defendant argues that "all evidence gained as part of [her SEC depositions] should not have been used at trial because it violated Ms. Baylor's Fourth Amendment Rights." (Def. Mot. at 9.) Defendant asserts that her Fourth Amendment rights were infringed because she was "not notified of the possible criminal repercussions of the civil investigation," and thus, these depositions should have been suppressed. (*Id.*) Defendant further asserts that she did not file a pretrial suppression motion because it was "unanticipated" that the government would place such "heavy reliance on [the] deposition testimony at trial." (Def. Reply at 6.) Defendant's arguments are flawed for several reasons.

Defendant did not make a pretrial suppression motion related to her SEC depositions, nor did she ever suggest that these deposition excerpts should be suppressed when the depositions' admissibility was addressed during pretrial proceedings. On March 4, the government filed its preliminary exhibit list, which included the entirety of these two depositions in both video and transcript form. (Gov't Prelim. Ex. List at 20, 23, ECF No. 54-1.) On March 19, defendant filed a list of objections to the government's exhibit list, in which she objected to the admission of these deposition exhibits solely on the basis of "relevance." (Def. Initial Obj. to Gov't Exhs. at 4, ECF No. 57-1.)

Defendant then made a supplemental filing regarding her objections to the government's exhibits on March 22, at which time defendant told the Court that the parties were attempting to confer regarding these depositions and requested that the Court defer ruling on the depositions. (Def. Suppl. Obj. to Gov't Exhs. at 5–6, 12–13, ECF No. 59-1.) The parties ultimately resolved the majority of their disputes regarding the admissibility of these depositions, with defense

---

[11] Defendant also introduced portions of these same depositions. (*See* Def. Exhs. 18, 19.)

14

counsel telling the Court on April 8 that he wished for the Court to rule only on his objections to two short deposition excerpts that the government intended to introduce, despite the fact that the government intended to introduce many more deposition excerpts. (Apr. 8 Tr. at 2–8.) Notably, neither of these two objections to the admission of deposition testimony relates in any way to the basis for this new trial motion. (*See id.*)

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), a motion to suppress must be made before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." The basis for defendant's present argument was readily available and could have been determined before trial.

Rule 12 provides an exception, whereby the Court "may" consider a late-made argument "if the party shows good cause." Fed. R. Crim. P. 12(c)(3). Defendant attempts to show good cause by saying that she did not know the government would rely heavily on the deposition testimony in its case. (Def. Reply at 6.) This argument is baseless, as one of the counts on which she was tried was obstruction of justice for lying at these depositions. Furthermore, the complete deposition transcripts and videos were on the government's proposed exhibit list, and defense counsel actively conferred with the government regarding which excerpts would be presented to the jury and what, if any, objections by defense counsel would be ruled on by the Court. At hearings on March 25, April 3, and April 8, the admission of Ms. Baylor's SEC depositions was discussed, but defense counsel never even alluded to this suppression argument.

Furthermore, even if defendant had not waived her right to file a motion to suppress, she has not demonstrated that such a motion would have been granted. Defendant has not offered any authority that it was a violation of her Fourth Amendment rights for the government to fail to provide something akin to a *Miranda* warning to her before her SEC depositions. The *Miranda*

doctrine is grounded in the Fifth Amendment, not the Fourth. *See Miranda v. Arizona*, 384 U.S. 436, 467 (1966). The Fourth Amendment only applies where a search or seizure has occurred, and it is not apparent how Ms. Baylor's testimony at a civil deposition involved either. Defendant's only case citation in support of her argument is to *United States v. Stamp*, in which the D.C. Circuit analyzed the validity of a defendant's consent to a search by a plainclothes IRS agent. (Def. Mot. at 8–9 (citing *Stamp*, 458 F.2d 759, 775 (D.C. Cir. 1971).) Given that Ms. Baylor's provision of testimony does not constitute a search, *Stamp*'s Fourth Amendment analysis does not further defendant's argument. *Stamp* also included a discussion of the Fifth Amendment in the context of addressing interviews conducted by IRS agents, but this analysis does not support Ms. Baylor's argument, as *Stamp* reiterated that *Miranda* warnings are not required for a suspect not in custody. *See Stamp*, 458 F.2d at 780–81. Thus, any invocation of *Miranda* does not justify a new trial.

Further, it bears noting that defendant was an attorney; she was represented by counsel at her depositions; at a deposition on December 6, 2011, she asserted her Fifth Amendment privilege to remain silent after her counsel acknowledged that he was aware of a pending DOJ investigation that could implicate his client criminally; and at the May 22, 2012 deposition, the SEC counsel confirmed on the record that defendant did not intend to assert the Fifth, despite SEC counsel's warning that the SEC viewed the conduct as criminal and hoped to interest the U.S. Attorney's office in bringing a criminal case. (*See* Gov't Opp. at 16–17; *see also* May 22, 2012 Dep. Tr. at 59–61, Gov't Proposed Ex. 362.)

As in the *Stamp* case, defendant was not an average deponent. *See Stamp*, 458 F.2d at 777. She was a lawyer, she had the assistance of counsel, she knew she could invoke the Fifth

Amendment, and she knew very early on that a criminal case was possible.[12] Moreover, defendant has not shown that she was prejudiced by the introduction of these deposition excerpts, given that the excerpts related principally to the obstruction of justice count on which she was acquitted, and defendant testified at trial consistent with the deposition excerpts that were introduced into evidence. The Court therefore denies defendant's request for a new trial on the basis of her suppression argument, which is both waived and without merit.

### E. Prosecution's Closing Argument

Defendant also argues that the Court should grant a new trial based on improper statements by the prosecution in closing argument. (Def. Mot. at 5–6.) In particular, defendant complains that the government engaged in speculation regarding whether an investment made by defendant's mother, Andree Gandy, was in fact an investment related to defendant's work with the Milan Group—or was instead a "mortgage payment" or for "some other household expense," and that the prosecution speculated that Ms. Gandy had given testimony to the SEC about her investment merely in an attempt to "try[] to help her daughter get out of . . . trouble" and "came up with this after." (*Id.* at 6 (quoting Apr. 25 am Tr. at 14–16).)

Defense counsel contemporaneously objected to each of these statements, and the Court sustained the objections. (Apr. 25 am Tr. at 14–16.) The Court told the jury that the statement about Ms. Gandy trying to help her daughter get out of trouble was "stricken" and that the comment about Ms. Gandy's check being for a mortgage payment or household expense was

---

[12] Based on the affidavit of Christopher Robertson, defendant's SEC counsel, which was filed with defendant's reply, counsel claims to have been told at some point before the May 22 deposition that the U.S. Attorney's office was no longer pursuing a criminal investigation. (*See* Robertson Aff. ¶ 6, ECF No. 136-1.) The status of any criminal investigation at that time is unknown, but it is known that at the May 22 deposition, the SEC lawyers made it clear that they thought her conduct could be considered criminal. (May 22, 2012 Dep. Tr. at 59–60, Gov't Proposed Ex. 362.)

17

pure "speculation." (*Id.*) Defense counsel asked for no additional curative instruction, nor did he move for a mistrial. (*See id.*)

In addition to these contemporaneous curative actions taken by the Court, the jury was instructed before closing arguments that "the statements and arguments of the lawyers are not evidence" and "[i]f any reference by . . . the attorneys to the evidence in this case is different from your own memory of the evidence, it is your memory that should control during your deliberations." (Apr. 24 am Tr. at 36–37.)

It is improper for a prosecutor's closing argument to rely on speculation or evidence not introduced at trial. *See, e.g.*, *United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998). To warrant a new trial, however, "[t]he prosecutorial misconduct must have affected the jury's ability to view the evidence fairly." *United States v. Borda*, 848 F.3d 1044, 1060 (D.C. Cir. 2017). "To determine the prejudicial effect of a closing argument error, th[e] Court examines three factors: (1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the error; and (3) the closeness of the case." *Id.* "Courts generally overturn convictions only upon a showing that improper remarks, in light of any rulings or curative instructions by the district court and in light of the trial as a whole, could reasonably have affected the jury's verdict." *United States v. Khatallah*, 313 F. Supp. 3d 176, 187 (D.D.C. 2018) (internal citation and quotation marks omitted).

Defendant asserts that the issue of Ms. Gandy's investment was central to her defense. (Def. Mot. at 2.) In particular, defense counsel argued at trial that Ms. Gandy's investment indicated that defendant did not know that the investment scheme was fraudulent, because otherwise she would not have encouraged her own mother to invest. (*See, e.g.*, Apr. 9 pm Tr. at 35–36 (defense opening statement).) While the prosecutor's rebuttal arguably relied on

speculative inferences regarding possible alternative explanations for Ms. Gandy's check, the prosecutor did not misstate the evidence, he did not attempt to inflame the jury, and these brief statements did not figure prominently in the prosecutor's closing. The Court took immediate steps to mitigate the effect of the prosecution's statements—striking a portion of the closing argument, sustaining defense counsel's contemporaneous objections in front of the jury, and telling the jury that the objected-to statements were mere speculation. Additionally, when considered as a whole, this case was not close. The Court thus concludes that the statements of which defendant complains "could [not] reasonably have affected the jury's verdict" and a new trial is not warranted. *Khatallah*, 313 F. Supp. 3d at 187.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that defendant's motion for new trial, (ECF No. 127) is **DENIED**, and the government's motion for leave to file a sur-reply (ECF No. 141) is **DENIED AS MOOT.**

ELLEN S. HUVELLE
United States District Judge

Date: August 2, 2019