UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| : | Criminal No.: 16-cr-180 (ESH) |
| v. : | |
| : | Hon. Ellen S. Huvelle |
| BRYNEE BAYLOR, : | |
| : | |
| Defendant. : | |
| : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, hereby submits this memorandum in aid of the sentencing of defendant Brynee K. Baylor ("Baylor" or the "defendant"). The government also simultaneously submits a Supplement on Restitution, which includes a proposed restitution chart and further explanations on specific restitution questions as directed by the Court. The government respectfully requests that the Court sentence Baylor to a term of imprisonment within the advisory U.S. Sentencing Guidelines of 70 to 87 months, including 12 months on the tax count, and order restitution of $2,210,716 to her victims.

### I.   FACTUAL BACKGROUND

The Court is deeply familiar with the offense conduct in this case, having presided over Baylor's three-week trial in April 2019. In addition, a comprehensive overview of the offense conduct and relevant background information is set forth in the Pre-Sentence Investigation Report dated July 30, 2019 ("PSR"). (See PSR ¶¶ 8-69.) This section therefore provides a high-level overview of the basic facts of the fraudulent scheme carried out by Baylor and others, which serves as important background information for the offense conduct.

Between July 2010 and September 2012, Baylor conspired with Frank Pavlico, a/k/a Frank Lorenzo, the president and CEO of Milan Group, to operate and promote a fraudulent

trading program that purported to generate extremely large profits in a short period of time with little or no risk. (Id. ¶ 14.) In 2010 and 2011, investors deposited more than $2 million in Baylor & Jackson's law firm interest on lawyer's trust account ("IOLTA"), often on representations that the investment would succeed and provide extraordinarily high returns within a short period of time, that these returns had been realized in the past, that investors could get their funds back if for some reason the investment did not succeed, that any fees would be taken out of the profits and not the investors' principal, and that the investment money would not be at risk. (Id. ¶¶ 17-18, 20, 52.)

Ten of the investor-victims of this fraudulent scheme testified at Baylor's trial.[1] Every one of these witnesses corroborated one or more of the fraudulent elements of the scheme as articulated above. This witness testimony was further substantiated when Baylor was recorded by FBI agents posing as potential investors on an undercover telephone call. (Id. ¶ 47.) During this call, the defendant endorsed an investment return of 250%, explaining that all of the money goes to the investment. (Id.) She told the undercover agents: "There's no money that goes, you know, to fees or anything. Anything else comes from your -- from your profits." (Gov't Tr. Ex. 438-23.2T.) She further stated: "But, again, it is not supposed to even be moved. No one spends that money. That money is escrowed the entire time." (Id.) In fact, none of the investor funds were escrowed for very long. The evidence at trial proved that after the investors sent their money to her IOLTA, the defendant transferred these funds out within a few days. During her trial testimony, Baylor admitted that none of the investors were ever paid back. Baylor, however, profited approximately $150,000. (PSR ¶ 74.) Her law partner profited the same amount. (Id.) Her law firm profited by an additional $500,000. (Id. ¶¶ 19, 74.) And Baylor sent

---

[1] Cort Wiegand, attorney for investor-victims Joe and Gloria Wu, is included in this number.

more than $800,000 to Frank Pavlico, her co-conspirator. (Id. ¶ 74.) In terms of fairness, Baylor and her friends took hundreds of thousands of dollars while the investors – several of whom withdrew funds from their retirement accounts to invest with Baylor – suffered and continue to suffer as a result of their involvement with the defendant.

## II. SENTENCING CONSIDERATIONS

### A. Legal Standard

In formulating an appropriate sentence to address the defendant's crimes, the Court must accurately compute the United States Sentencing Guidelines. Although the Guidelines are now advisory, "[a]s a matter of administration and to secure nationwide consistency, the [United States Sentencing] Guidelines should be the starting point and the initial benchmark" for sentencing. Gall v. United States, 552 U.S. 38, 49 (2007). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). At sentencing, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

### B. United States Sentencing Guidelines

As set forth below, the government respectfully submits (1) the accurate Guidelines range is 70-87 months, and (2) restitution to the victims is mandatory in the amount of $2,210,716.[2]

#### 1. *Offense Level*

The base offense level is 7. (PSR ¶ 104; U.S.S.G. § 2B1.1(a)(1).) The loss amount attributable to the defendant is more than $1.5 million but not more than $3.5 million, which results in an increase of 16 levels. (PSR ¶ 105; U.S.S.G. § 2B1.1(b)(1)(I).) The offense involved 10 or more victims, resulting in an increase of two levels. (PSR ¶ 106; U.S.S.G. § 2B1.1(b)(2)(A)(i).) The defendant abused a position of trust, and used a special skill, resulting in an additional increase of two levels. (PSR ¶ 108; U.S.S.G. § 3B1.3.) The total offense level is 27. (PSR ¶ 113.) U.S. Probation concurs with this assessment. (See id.)

Because this Guidelines range is in Zone D of the Sentencing Table, the Guidelines "do not authorize a sentence of probation." U.S.S.G. § 5B1.1 cmt. 2; see also U.S.S.G. § 5C1.1(f) ("If the applicable guidelines range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment."). As a result, Baylor "is ineligible for probation." (PSR ¶ 174.)

#### 2. *Specific Offense Characteristics: 10 or More Victims*

U.S.S.G. § 2B1.1(b)(2)(A)(i) provides that a defendant should receive a two-level enhancement if her crimes involved 10 or more victims. A victim includes "any person who sustained any part of the actual loss." U.S.S.G. § 2B1.1 cmt. n.1. As addressed in the

---

[2] As addressed in greater length in the government's supplemental sentencing brief on restitution, this district court has already found by a preponderance of evidence – the same standard applied here for sentencing – that Baylor must pay compensation in a similar amount. This proposed restitution figure represents the amount the district court ordered in the SEC case (App'x C at 4) minus the pro rata amounts already paid to investors (App'x A at 6) plus the loss amount related to Sandra Smith (Doc. 136 at n. 4; App'x A at 6).

government's supplemental sentencing memorandum, there are 20 victims (19 victims identified by the SEC, plus Sandra Smith) who invested money in the defendant's fraudulent investment program and wired funds directly into her IOLTA or, to a much lesser extent, to Pavlico's Milan account.  (See also PSR ¶ 193.)  This supplemental memorandum demonstrates the government has satisfied the burden for this enhancement.

### 3. *Specific Offense Characteristics: Abuse of Position of Trust*

U.S.S.G. § 3B1.3 provides that a defendant should receive a two-level enhancement if she "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  The commentary to this Guidelines section identifies "lawyers" as the type of persons possessing a "special skill not possessed by members of the general public and usually requiring substantial education, training or licensing."  U.S.S.G. § 3B1.1 cmt. n.4.

The evidence at trial established by a preponderance that Baylor used her "special skill" as an attorney to "significantly facilitate" the commission of her crimes, and U.S. Probation correctly applied the "abuse of trust" enhancement.  Specifically, the defendant conspired to "promot[e] the purported trading program and recruit[] and retain[] investors by playing upon investors' trust . . . due to her status as a Washington, D.C. attorney and partner of Baylor & Jackson."  (PSR ¶ 17).  In so doing, she "played up her status as an attorney to recruit investors" (see id.; see also Indictment ¶ 15), and she placed investor funds into her IOLTA, guaranteeing the money would be safe there (PSR ¶ 18).

In addition, the enhancement is separately applicable because the defendant's actions in furtherance of the fraudulent scheme – guaranteeing investors their funds would not be moved, promising investors their investment would return an outlandish profit in a short period of time,

falsely stating she had seen other investments succeed in the past, sending false "attorney attestation letters" to investors, fraudulently using a notary stamp to make documents appear legitimate, and serving as the "closer" on telephone calls with potential investors, among other items – constituted an abuse of trust. Accordingly, the Court should find that the two-point enhancement pursuant to U.S.S.G. § 3B1.1 applies, for both reasons: (1) Baylor used her legal training and status as a lawyer to advance her crimes, and (2) Baylor abused her position of trust with the investors.

4. *Acceptance of Responsibility*

The defendant pleaded guilty to Count 10, which charged her with failure to file a tax return for 2010 and failure to pay her taxes for that year. The defendant is not entitled to any downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) in consideration for her plea, and the government would oppose any such motion raised by the defendant. (See PSR ¶ 99.)

The defendant went to trial on the majority of charges against her. Credit for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt. n.2. Any assertion by Baylor that she has accepted responsibility is at odds with the evidence introduced at trial that resulted in the jury's finding of guilt on seven of nine counts. Throughout the trial and in the earlier civil litigation brought by the SEC, Baylor repeatedly denied the misconduct of which she has been convicted, attempted to justify her fraudulent behavior, and blamed third parties including Frank Pavlico and Valner Johnson. She has not accepted responsibility for her crimes. Indeed, the defendant recently filed a motion for new trial, asserting among other arguments that the

government failed to prove she had "actual knowledge" of the crimes for which she was charged. (Doc. 127 at 1; Doc. 136 at 2-3.)

### 5. *Advisory Guidelines Range*

The total offense level of 27 with criminal history category I corresponds to a sentencing range of 70-87 months in prison. (See PSR ¶ 154.)

## C. Consideration of the 18 U.S.C. § 3553(a) Sentencing Factors

In addition to considering the United States Sentencing Guidelines, in fashioning an appropriate sentence the Court must also consider the sentencing factors set forth in 18 U.S.C. § 3553(a). A thorough consideration of the § 3553(a) factors indicates that an appropriate sentence within the Guidelines range of 70-87 months is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

### 1. *The Nature and Circumstances of the Offense*[3]

The defendant, a well-educated lawyer and law firm partner, willfully engaged in and operated a fraudulent securities scheme. The money she earned from the scheme went to her co-conspirators, her law firm, her law partner, and herself. She engaged in this conduct after repeated warnings from investors and her co-conspirators themselves.

The defendant directed the victims of the fraud to send their investments to her law firm's IOLTA. She did this because it gave the investment legitimacy and made the investment seem safe to the investors. Indeed, this practice helped induce the investors – many of whom testified that they trusted the defendant because she was an attorney, and because their investment would go into her IOLTA – to make an investment. The investors testified that they had no idea the defendant would remove their investment from her IOLTA and distribute it to herself and others

---

[3] 18 U.S.C § 3553(a)(1).

within days, and every testifying witness stated at trial they would never have invested had they known this fact. Likewise, the defendant's use of a notary stamp that did not belong to her further demonstrates the illicit nature of her actions. She used the notary stamp to lend authenticity and legitimacy to bogus documents, such as false "attorney attestation" letters.

The facts of this case require a sentence of substantial incarceration. At trial, Baylor portrayed herself as naïve and believing. In reality, she received plenty of actual notice and warning about the fraudulent nature of the scheme. For example, on March 5, 2011, investor Brent Brown sent email to Baylor attaching an "FBI NOTICE" about "investment schemes which appear to be fraudulent." (Gov't Tr. Ex. 34-R.) On June 25, 2011, Pavlico responded to an email from the defendant herself about the fact that the SEC was investigating the transaction. (Gov't Tr. Exs. 145, 570, 571.) On June 29, 2011, she received a Department of Justice press release about Valner Johnson, showing Johnson had pleaded guilty to making false statements to FBI and had been disbarred. (Gov't Tr. Ex. 550.) At trial, whenever the defendant was confronted with this direct notice of the criminal nature of the investment scheme, she implausibly claimed she did not recall ever having reviewed such evidence. In convicting her, the jury necessarily found that the defendant knew what she was doing was wrong. Indeed, evidence not introduced at trial validates the jury's verdict: even after investor Brent Brown filed a bar complaint against Baylor in April 2011, she persisted in taking money from investors over the next several months. (See PSR ¶ 73.)

The evidence at trial also proved the defendant intentionally refused to return the investors' money. When the investors requested their money back, the defendant deflected and obfuscated. One witness, Sidharth Dugar, testified to having exchanged several hundreds of emails with the defendant; in many of these emails, he sought an update on the investment or

expressly requested to have his money returned. The defendant never returned his money. Another witness, Cort Wiegand, testified that his clients, Joe and Gloria Wu, repeatedly contacted the defendant for a return of their funds. Wiegand and other witnesses testified that the defendant deliberately avoided communicating with the actual investors, such as the Wus, opting instead to communicate only with a third party intermediary who either had not invested or had made a smaller investment than the victim. The defendant never returned the Wus' money, either, in spite of their frequent entreaties. The sentence imposed by the Court must reflect the nature and circumstances of Baylor's deep involvement in the fraudulent scheme and intentional refusal to return investor funds upon request.

2. *Need for Sentence to Reflect Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment for the Offenses*[4]

The defendant's crimes were serious in nature, and her sentence should likewise be equally serious. Over a period of more than a year, the defendant caused investors to transfer more than $2 million into her law firm's IOLTA. She falsely assured investors that the purported trading program was legitimate and had little if any risk, falsely claimed she had previously observed investors successfully complete transactions with Milan Group, and failed to return any money invested, all while using her status as a lawyer to lull the investors for as long as possible.

The Guidelines make clear that there is no carve-out for white-collar criminals. See 28 U.S.C. § 994(d) (requiring the Guidelines to be "entirely neutral as to the . . . socioeconomic status of offenders"); USSG §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic

---

[4] 18 U.S.C. § 3553(a)(2)(A).

status is "not relevant in the determination of a sentence").  While this Court may certainly consider collateral consequences in formulating the appropriate sentence, it should reject any attempts by the defendant to replace the appropriate sentence with one specifically crafted for her substantial education, privileged background, or the white collar nature of her crimes.

Furthermore, the sentence imposed in this case must reflect the fact that the defendant failed to timely report any income for a two-year period and failed to pay her taxes, despite her status as a lawyer and prior taxpaying behavior, both of which demonstrate she was aware of her obligations to report all income.  The Supreme Court has long-recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."  See Spies v. United States, 317 U.S. 492, 495 (1943).  A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe.  Indeed, as Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for civilized society . . . ."  Compania General de Tabacos de Filipinas v. Collector of Internal Revenue, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).  Taxes are necessary to run all functions of an efficient government.

While bilking investors as part of her fraudulent investment scheme, the defendant simultaneously failed to report any of this income to the IRS.  She only filed her 2011 tax return after receiving a target letter from an IRS investigator.  These are the actions of an individual who believes she is above the law.  Only a sentence of incarceration will reflect the seriousness of Baylor's crimes, promote respect for law, and provide for just punishment in this case.  Indeed, a reduced sentence for a person with Baylor's specific education, training, and

knowledge of securities and tax matters would undermine the directives of Section 3553(a)(2)(A).

       3.  *Deterrence*[5]

The sentence imposed should "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The need for general deterrence is particularly important in the context of white-collar crime." United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018); see also, United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259) ("Congress viewed [general] deterrence as 'particularly important in the area of white collar crime.'"); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." Johnson, 2018 WL 1997975 at *5; see, e.g., Martin, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks and citation omitted)); see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").

---

[5] 18 U.S.C. § 3553(a)(2)(B).

General deterrence also plays an important role in sentencing for criminal tax offenses. United States v. Pugh, 515 F.3d 1179, 1194 (11th Cir. 2008). The Sentencing Commission has stated:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would be violators.

(Introductory Cmt. to U.S.S.G. § 2T1.1.)

The sentence imposed in this case should send a message to other potential tax cheats that imprisonment is a reality for individuals who violate the internal revenue laws, and there are no exceptions for white collar criminals who can afford a robust defense. Only a sentence of imprisonment makes clear that there are significant consequences for stealing from the U.S. Treasury. As such, the government specifically requests that any prison sentence include one year of incarceration on the § 7203 count, regardless of whether this sentence is imposed concurrently or consecutively with prison time imposed on the conspiracy and fraud counts. A sentence of prison time on the tax count will help send a message to taxpayers that violating the nation's tax laws will be taken seriously and met with real consequences.

Specific deterrence, likewise, is important because the defendant has not just refused to acknowledge the criminality of her conduct but has repeatedly attempted to blame to others. Indeed, it also appears the defendant has purposely engineered her assets to avoid paying restitution ordered in this district court in the prior civil case brought by the SEC. Specifically, the defendant informed the Probation Officer that she has <u>no assets</u>. "She stated she does not have a bank account, income, a vehicle, or any real estate property. She indicated she is entirely

supported by her boyfriend . . . who is also paying for her legal fees." (PSR ¶ 144.) The defendant works for her boyfriend's film production company, where she earns $3,500 to $5,000 per project. (Id. ¶ 142.) But the defendant explained that he "handles the finances and she does not personally receive income from the business." (Id.) In other words, it appears the defendant has intentionally chosen to forego the very salary she admits to earning. It is unclear why the defendant would forego a salary other than to avoid paying creditors, escape the judgment imposed on her in the SEC litigation, or prevent herself from generating income that would be reportable on annual tax returns.

4. *Kinds of Sentences and Sentencing Ranges Established by Guidelines*[6]

As this Court is well aware, the Sentencing Guidelines reflect the consensus that individuals convicted of economic crimes should not avoid incarceration, even where such crimes constitute a defendant's first offense. One of the goals of the Sentencing Reform Act of 1984 was to rectify a serious problem in the criminal justice system: "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." See U.S.C.C.A.N., 98th Cong., 2nd Sess. (1984) at 3260. Requiring confinement for white collar crimes addresses the considerable harm these crimes cause society.

Justice Breyer, previously an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders,

---

[6] 18 U.S.C. § 3553(a)(4).

> including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988).  This approach provides just punishment for the considerable harm that white collar crimes cause society.

Here, the defendant engaged in a lengthy and elaborate fraud that bilked her victims of millions of dollars.  Several of the victims, such as Joseph Hunsberger, withdrew funds from their retirement savings to invest in the defendant's bogus trading program.  Her offense merits a term of imprisonment.

### III.     RESTITUTION

The government respectfully requests the Court order the defendant to pay restitution as a condition of supervised release in the amount of $2,210,716.  (See 18 U.S.C. § 3583.)  The Mandatory Victims Restitution Act ("MVRA") requires that a defendant convicted of specific offenses "in which an identifiable victim or victims has suffered a . . . pecuniary loss" be ordered to make restitution to the victim. 18 U.S.C. § 3663A(a)(1), (c)(1).  For the reasons set forth above and in the government's supplemental memorandum, the facts show by at least a preponderance of the evidence that Baylor's victims suffered total actual losses of $2,210,716. (See also PSR ¶¶ 191-194.)

Consequently, the Court should order Baylor to pay restitution to her victims in this amount, as delineated in the government's supplemental sentencing submission.  To the extent the Court ultimately determines that Baylor's victims suffered an actual loss that is greater or lesser than the actual loss calculated by the government, the Court should order Baylor to pay restitution to her victims in the amount of that actual loss.

## IV. **CONCLUSION**

For all of the reasons stated above, the government respectfully requests this Court to sentence the defendant to prison within the Guidelines range of 70-87 months, including 12 months on Count 10, followed by a three year period of supervised release, and restitution in the amount of $2,210,716.

Respectfully submitted,

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

By: /s/ Eric B. Powers
Jeffrey A. McLellan, Trial Attorney
Eric B. Powers, Trial Attorney
U.S. Department of Justice, Tax Division
150 M Street, N.E.
Washington, DC 20002
Telephone: (202) 616-5130
Eric.B.Powers@usdoj.gov
Jeffrey.A.McLellan@usdoj.gov

Dated: August 28, 2019

CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2019, a copy of the foregoing document was sent via electronic case filing to all counsel of record in this case.

By: /s/ Eric B. Powers
Eric B. Powers
Trial Attorney